## No. 13,788.

## ELIAS A. PHARR ET ALS. VS. M. L. BROUSSARD ET ALS.

### SYLLABUS.

1. Where three persons are operating under a contract whereby one of them furnishes trees, upon land believed to be owned by him, another furnishes money, and the third, labor, whereby said trees are to be placed on the market, as timber, and the profits are to be divided; and the two parties last mentioned take advantage of what is apparently a technical defect in the title of the other, to enter his land for themselves, taking patents therefor, but are subsequently cast in a litigation upon the subject of the title, they do not occupy a particularly strong position from which to appeal for equitable consideration.

2.  Upon the facts, as presented in this case, the plaintiffs are held not entitled
    to recover money expended by them in deadening, topping and trailing trees,
    upon land owned by the defendants.

A PPEAL from the Nineteenth Judicial District, Parish of Iberia—
    *Weeks, Judge ad hoc.*

*Andrew Thorpe* and *Thomas H. Thorpe,* for Plaintiffs, Appellants.

*Broussard, Dulany & Dunbar,* for Defendants, Appellees.

*Robert Martin,* for Levert & Martin, called in warranty, Appellees.

The opinion of the court was delivered by

MONROE, J.  In August, 1895, M. L. Broussard and Hazard Vaughn
(made defendants herein) brought suit in the District Court for the
Parish of Iberia, claiming to be the owners, in possession, of certain
swamp lands in that parish, and alleging that Elias A. Pharr and Her-
man H. Shadel (the present plaintiffs) had, without color of right, re-
moved therefrom a lot of the timber, and had deadened and felled there-
on a number of trees, which they were likely to remove unless re-
strained, and they prayed that said parties be injoined from further
entering upon said land and from further deadening, felling, or remov-
ing said timber, and for a writ of sequestration, directing the sheriff
to seize the timber already deadened and felled, etc.  The defendants
answered, setting up title and claiming that, in any event, they ought
to be reimbursed the money expended by them in deadening and topping
the trees and in doing certain work preparatory to their removal. Upon
the issues as made up, there was a trial which resulted in a judgment
for the plaintiffs, decreeing them to be the owners of the land, main-
taining the injunction, and reserving the rights of the defendants with
respect to their claim for reimbursement; and the judgment so ren-
dered was affirmed on appeal to this court.  Broussard *et als.* vs. Pharr
*et als.,* 48th Ann. 230.  Thereafter, in July, 1897, the defendants in
that case brought the present action against their former adversaries
upon substantially the same claim which they had set up in their answer
to the suit against them, but which had not been passed upon; and they
here pray judgment for $2026.45, as the aggregate amount expended
for deadening, felling, topping, trailing and retrailing trees, and for
the making of "pull roads," of all of which work, they allege that the

defendants have derived the benefit. The defendant, M. L. Broussard, was dismissed from the case, before trial upon the merits, upon an exception to jurisdiction *ratione personae,* and there appears to have been no appeal from the judgment whereby said exception was maintained. As between the plaintiffs and the other defendant, Vaughn, the case stands as follows, to-wit:

Junius Sampson held the land in question, as owner, by virtue of a title which traced back, through *mesne* conveyances, to two certificates issued by the Register of the State Land Office, March 3rd, 1847, followed by the location of the land and the registry thereof, March 6, 1847, but no patent had issued. In 1883, he entered into a verbal agreement, which was followed, on October 10th, 1884, by a written contract, with Pharr and Shadel, the plaintiffs herein, viz:

"State of Louisiana—Parish of Iberia.

"Know all men by these presents, that we, Junius Sampson, Herman Shadel and E. A. Pharr, all of the parish and State aforesaid, have this day entered into the following agreement, to-wit: The said Junius Sampson to furnish the cypress trees growing and standing in his swamp in this parish, the said Shadel to cut down and float this timber, and said Pharr to furnish all the money necessary for that purpose to said Shadel. And the said Pharr hereby binds and obligates himself to receive and to pay for all timber floated by said Shadel the sum of six dollars per thousand feet, it being well understood by the parties hereto that, after deducting all expenses for cutting down, floating, etc., of said timber, the net profit remaining from the sale of same at above stipulated price is to be equally divided between them."

The parties carried on business under this contract for several years, until it came to the knowledge of Pharr and Shadel that Sampson, though his title, and that of his authors, had been of record for more than forty years, had never obtained a patent, and that there was a possibility that the land might still be purchased from the State, as swamp land; and, whilst their contract with Sampson was still in force, they succeeded in obtaining such titles from the State, and afterwards informed Sampson of what they had done. The evidence as to the details is somewhat obscure, part of the land having been entered by St. Martin and Toffier, who sold to Pharr and Shadel, and part of it having been entered by Gates, who sold to Todd, who sold to Pharr and Shadel. Shadel, however, in his testimony, speaks of having bought the land from the State. Thus, he says:

"I notified Mr. Sampson as soon as I bought the land from the State. Sampson told me that, though the title he had was good, for me to continue my work—if the land was mine I would have my work done, and if the land was his I would work under the same contract. Mr. Warren was, with Mr. Charles Gutterkuntz, the surveyor, surveying the land, hunting out which was the best piece of land. I found that they were trying to enter the land which I had contracted to work under Sampson's contract. I went out to see Sampson and notified him of the fact, he, not being home, being in the city at the time, I got Mr. Todd and Gates to enter some of the same lands which Sampson claimed. When Sampson returned, I informed him of what I had done," etc.

And, thereupon, it appears that there was an agreement that the question of title should be submitted to arbitration, and if Sampson's title was sustained, the partnership contract was to hold good, whereas, if Pharr and Shadel's title was sustained, the partnership was to be considered at an end. The idea of the arbitration was, however, never carried out. After entering the lands, as stated, Pharr and Shadel continued to work them, but they divided no profits with Sampson. In fact, the latter says, in his testimony (given in 1895 on the former trial) : "The last credit given me by Pharr and Gall (Shadel) for my share of timber taken from the swamps was about ten years ago."

Such being the situation, Sampson, upon March 11, 1895, sold his entire place, including the swamps in question, to Levert and Martin. And upon April 10th, following, Levert and Martin sold the property here in controversy to Broussard and Vaughn, the defendants, for $2000; and Broussard and Vaughn, after selling part of the timber, sold the land to M. J. Voorhies and others for $1000.

The contract between Sampson and Pharr and Shadel was not so recorded as to operate as an encumbrance upon the property, or as a notice to any vendee to whom Sampson might choose to sell. Levert and Martin, therefore, acquired a clear title, so far as the present claim is concerned, and sold to Broussard and Vaughn in the same way. Martin, testifying upon the subject, says:

"Before J. B. Levert and myself purchased Marshfield plantation, of which the swamp lands described in plaintiffs' petition form a part, we engaged the services of Messrs. Foster & Broussard, attorneys of the defendants in this suit, to look up the title to Marshfield, and their written report shows that the titles thereto were good, and that there was no recorded contract or lease, on file, and of record in the Recorder's

office of Iberia parish, affecting any portion of Marshfield plantation. Mr. Levert and myself bought the Marshfield plantation on March 11, 1895, from Mr. Junius Sampson; that neither at that time, nor previous, or since, has Mr. Sampson, or any one else, informed either Mr. Levert or myself of any contract or agreement made with plaintiffs in this suit relative to said swamp or anything else. Neither I nor Mr. Levert had, at any time, any knowledge of work having been done on said lands by the plaintiffs herein."

It further appears from his testimony that he and Levert bought the property in order to divide and sell it; that, after buying it, he employed Broussard and Vaughn to inspect the swamps and report upon their value; that they reported that they were worth $2000, and, after trying to get a better price elsewhere, Levert and Martin sold said swamps to Broussard and Vaughn at that price. Mr. Martin says:

"It may be that, at the time they reported the value of the swamps, they stated that there was deadened and trailed timber thereon, but, in selling them the swamps, I did not take that into consideration; our deed shows for itself. If they did state to me, at the time, that there were deadened trees in the swamps, I would not have noticed it, because I know that, for quite a number of years, depredations and trespasses have been, and are being, committed on swamp land in that section of the country, under pretended titles, both on private and public lands. I certainly would not have sold the swamps for $2000, on credit, if I had known that there were trees on it worth $17,500.00, as alleged in suit 2406, especially as we bought the land as a speculation, to sell it in pieces, and not to keep it as a whole."

And, it also goes without saying that he would not have sold the land to Broussard and Vaughn for $2000, on credit, if he had supposed that he would, or could, be called on to pay them, in cash, the $2026.45, which is here claimed by them in their call in warranty.

And so, with regard to Broussard and Vaughn. They bought the property from Martin and Levert, and if the latter acquired a clear title from Sampson, and imposed no incumbrance on it, it follows that their vendees acquired a clear title from them. And neither vendors nor vendees were obliged to go outside of the mortgage and conveyance records for the purpose of inquiring, by whom, or for what purpose, the trees had been deadened and trailed, and the "pull roads" made. It may be remarked here that when the patents under which the plaintiffs claimed title were issued, the State Register of Lands warned the appli-

cants that the lands had probably been located and that they entered said lands at their own risk; and when Broussard and Vaughn, having acquired title from Martin and Levert, applied for patents, that official recognized their right to the same and issued the patents, at the same time notifying the parties to whom the patents had been previously issued to return the same for cancellation. These matters are thus referred to in the opinion in the 48th Annual, to-wit:

"The testimony of the Register of the State Land Office was taken under commission and the purport of his evidence is, that the patents upon which the defendants base their title were issued by him to the defendants' vendors under the impression that the land had (not?) been previously located and confirmed by the Secretary of the Interior. That, notwithstanding the records of his office did not, at the time, exhibit any evidence that such location had been made, he was under the belief that such was the fact, and that he so informed the applicant and he agreed to accept the patents at his own risk. That, when the aforesaid exhibits and proofs of the prior location of said lands were presented to him, he became satisfied that the patents he had issued were erroneous, and he thereupon issued the patents of the defendants, and gave the first patentees due notice thereof."

· Broussard et als. vs. Pharr et als., 48 Ann. 235.

If, upon being informed of the claim set up by his partners, Sampson had brought suit in vindication of his title, and had obtained judgment, as did Broussard and Vaughn, declaring that title to be good, the position of the present plaintiffs with respect to their claim for disbursements inuring to the benefit of the owner would have been somewhat stronger, though it must be admitted that, in view of the relations subsisting between them and Sampson, at the time of their acquisition of the adverse title to his land, that position is not a particularly advantageous one from which to make an appeal to a court of equity, nor is it improved when we consider that they had been operating upon his land, for about ten years before the filing of the former suit, for their own benefit and to his exclusion.

As the matter stands, however, the sale of the property by Sampson to Levert and Martin, and by Levert and Martin to Broussard and Vaughn, introduces another element into the case. These vendees are, to say the least of it, quite as innocent and quite as much entitled to equitable consideration as the plaintiffs, who, having taken no steps to dispossess Sampson, under the adverse title set up by them, were, vir-

## TERM OF 1901-1902.                          65

Ice, Light, and Waterworks Co. vs. City of Lake Charles.

tually, held by the judgment in the first suit to have been mere disturbers of the possession of the lawful owners.

In the matter of Lumber Co. vs. Shadel *et al.*, 52 Ann. 2094, involving part of one of the same sections of land which is the subject of the present controversy, the defendants (being the same parties who are plaintiffs here) were held to have been possessors in bad faith, and the claim which they there set up for reimbursement of expenses incurred in deadening trees, etc., allowed in the lower court, was rejected by this court. For the reasons which have been stated, the instant case appears to be somewhat stronger against them than the case thus referred to, and the judgment of the court *a qua* rejecting their demands is affirmed.